**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

05 JAN 10  PM 4: 28

THADDEUS M. KORBIN,

    Plaintiff,

vs.

                                   CV-03-1167 MV/ACT

PUBLIC SERVICE COMPANY OF
NEW MEXICO,

    Defendant.

## DEFENDANT PNM'S BRIEF IN SUPPORT OF ITS OBJECTION TO DISCOVERY ORDER CONCERNING DOCUMENTS IDENTIFIED ON PRIVILEGE LOG

COMES NOW Defendant Public Service Company of New Mexico ("PNM), by and through its attorneys, Keleher & McLeod, P.A. (Robert C. Conklin and Christa M. Hazlett), and pursuant to the Court's Discovery Order Concerning Documents Identified on Privilege Log ("Order"), makes the following objection to the Order:

I. Introduction.

Defendant implores the Court to reverse its preliminary ruling and find that Defendant's Privilege Log Document No. 25 ("Document No. 25") is both attorney-client privileged and work product, and therefore should not be produced.[1] Defendant adamantly objects to the Court's finding that Document No. 25 is not attorney-client privileged and the finding that Plaintiff has made the required showing to discover trial preparation materials. Defendant strongly believes that production of Document No. 25 would compromise Defendant's ability to prepare for trial as the document reveals privileged communications and the thought processes

---

[1] Defendant does not object to production of Documents No. 11 and 14 and will produce those documents to Plaintiff on January 10, 2004.

and mental impressions of counsel. As such, Defendant asks that it not be required to produce Document No. 25.

II.     Document No. 25 is an Attorney-Client Communication Conveyed for the Purpose of Providing Legal Advice and Was Circulated only to those Employees Who are Authorized to Speak on the Matters Concerned.

Document No. 25 should not be ordered produced because it is an attorney-client communication that falls within the attorney-client privilege. Document No. 25 contains an e-mail message and attached EEO Summary Reports. It is a communication from the Manager of Compensation and Benefits, Gene Bermudez, to in-house counsel and other employees, all of whom are authorized to speak for PNM on the matters contained in the document. Therefore, the communication is covered by the attorney-client privilege.

The U.S. Supreme Court has taken an expansive view of the attorney-client privilege in the corporate context. Wright, Miller, and Marcus § 2107, citing Upjohn Co. v. United States, 449 U.S. 383, 101 S.Ct. 677 (1981). The Upjohn Court held that the privilege should *not* be limited to officers who play a substantial role in deciding and directing a corporation's legal responses. Id. at 393. Instead, the court found corporate communications privileged where (1) the communication was made by a corporate employee to corporate counsel at the direction of supervisory personnel; (2) the communication concerned matters within the scope of the employee's duties, and (3) the employee was aware that the communications were for the purpose of obtaining legal advice. Id. at 394.

In addition, the privilege is preserved where the documents in question are circulated among corporate employees who are authorized to speak on the matters dealt with in the documents or whose duties relate to the contents of the documents.   See FTC v.

2

GlaxoSmithKline, 294 F.3d 141, 148 (D.C.Cir. 2002) (the attorney-client privilege not waived where the corporation limited the dissemination to specific individuals whose corporate duties relate generally to the contents of the documents and admonished those individuals not to disseminate further); Wyoming v. U. S. Dept. of Agric., 239 F. Supp. 2d 1219, 1230 (D.Wyo. 2002)(holding that the confidentiality element of the attorney-client privilege is maintained if the documents in question were circulated among those agency employees who are authorized to speak on the matter dealt with in the documents); Scott Paper Co. v. United States, 943 F. Supp. 489, 499 (E.D.Pa. 1996).

Document No. 25 meets all of the above requirements. First, Mr. Bermudez's communication with Mr. Gonzales was at the direction of supervisory personnel. His supervisor, Margie Kufer, Director of Compensation and Benefits, directed him to perform work related to the reorganization. As part of his reorganization work, Mr. Bermudez communicated with Mr. Gonzales in Document No. 25 in response Mr. Gonzales' request for information and analysis[2]. (**Ex. 1**, Affidavit of Gene Bermudez at ¶¶ 2, 3, and 9; Docket no. 65, Affidavit of Ramon Gonzales, at ¶ 11(k).) Second, Document No. 25 concerns matters within the scope of Mr. Bermudez's duties. (Bermudez Affidavit at ¶ 6.) Mr. Bermudez made the communications regarding PNM matters as a PNM employee in response to a request from PNM's Chief Counsel. (Bermudez Affidavit at ¶¶ 2-3; Gonzales Affidavit at ¶ 11(k).) Third, Mr. Bermudez was aware that the communication was for the purpose of obtaining legal advice related to the reorganization. (Bermudez Affidavit at ¶ 7.)

---

[2] Because Mr. Bermudez is a manager, his communications with counsel are privileged even where his supervisor does not direct the communication.

Finally, the privilege has been maintained because all of the recipients are authorized to speak for PNM on the matters covered by the document. Ms. Kufer, as Mr. Bermudez's supervisor and Director of Compensation and Benefits, is clearly authorized to speak on the work of her subordinate concerning matters within the scope of his duties. Ms. Cobb, as the Senior Vice President and People Services and Development, is authorized to speak for PNM on all matters related to PNM's workforce. Finally, Vic Silva is also authorized to speak for the department on demographic analysis, as shown by his own EEO analysis of the reorganization, which has been produced to Plaintiff. (**Ex. 2**, Dep. of Vic Silva at 6:7-11.)

Because Document No. 25 is an attorney-client privileged communication, it is not discoverable. The document does not become discoverable even if Plaintiff showed a substantial need for the document and could not obtain the substantial equivalent of the document by other means. Because Document No. 25 is covered by the attorney-client privilege, it document should not be ordered produced.

III.    Alternatively, Document No. 25 should be shielded from Discovery because it is Work Product.

Even if the Court finds that Document No. 25 is not covered by the attorney-client privilege, it should not be ordered produced. Document No. 25 is work product[3], and Plaintiffs have not shown the special circumstances required to obtain the document.   Plaintiff is able, without undue hardship, to obtain the substantial equivalent of the materials by other means. Furthermore, Document No. 25 contains the mental impressions of counsel and PNM management regarding anticipated litigation, and Rule 26 mandates that mental impressions of a

---

[3] The Court found that Document No. 25 was prepared for counsel anticipation of litigation and thus is attorney work product. (Order at 2.)

party concerning anticipated litigation *not* be discovered, even when a substantial need and an inability to otherwise obtain the information is shown. For these reasons, Document No. 25 should be shielded from discovery.

> A.    Plaintiff has No Substantial Need for Document No. 25 Because He Can Obtain the Substantial Equivalent Without Undue Hardship.

Rule 26 defines the circumstances necessary to discover work product. The Rule provides that work product is discoverable only where the party seeking the documents (1) has a substantial need of the materials in preparation of his case, and (2) the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P 26(b)(3).

Here, Plaintiff has not met these special circumstances. Plaintiff is able to create the same comparison of Defendant's workforce as is contained in Document No. 25. On December 29, 2004, Defendant produced to Plaintiff a complete list of all PNM employees before the August 22, 2002, impactions. That list identifies each employee by organization, job title, supervisor, grade level, date of birth, and credited service date. Plaintiffs also have a list of all employees impacted on August 22, 2002, and some employees who were impacted at a later date. Organizational charts for the end of 2001 and 2002 have been made available to Plaintiff as well. With this information, Plaintiff can make any relevant before-and-after comparisons he desires, including, for example, comparisons of the number of employees in particular age groups, in certain grade levels, or who have a certain number of credited service years. There is no remotely relevant comparison contained in the EEO summary Reports that Plaintiff cannot do himself.

Performing such a comparison would not be an undue burden on Plaintiff. Surely Plaintiff already intends to do such analyses, as he specifically requested this information so that his statistician could develop statistical data to support his claim. As a result, Plaintiff is fully able, and has expressed a desire, to perform a workforce comparison substantially similar to that which is contained in the EEO Summary Reports. As Plaintiff has not made the showing required by Rule 26(b)(3), he is not entitled to discover work product Document No. 25.

    B.    Disclosure of Document No. 25 would Compromise Defendant's Trial Preparation and Contravene Public Policy.

Assuming *arguendo* that Plaintiff has met the special circumstances of Rule 26(b)(3), which is adamantly refuted, he is still not entitled to discover Document No. 25 because it contains the mental impressions of Defendant's legal counsel. As recognized by the U. S. Supreme Court in <u>Hickman v. Taylor</u>, allowing discovery of work product "contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." 329 U. S. 495, 510, 67 S. Ct 385 (1947). The Court noted that "it is essential that a lawyer work with a certain degree of privacy" because otherwise,

> much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness, and sharp practices would inevitably develop in the giving of legal advice and in preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

<u>Id</u>. at 510-511.

Similarly, Rule 26(b)(3) provides that "in ordering discovery of [work product] when the required showing has been made, the court *shall* protect against disclosure of the mental

impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Id. (emphasis added).

Disclosure of Document No. 25 would reveal the mental impressions of Chief Counsel for Operations, Ramon Gonzales, concerning exactly the type of litigation at bar. Mr. Gonzales anticipated that some terminated employees would likely sue over the loss of their jobs (Affidavit Of Ramon Gonzales at ¶ 8.), and he asked Mr. Bermudez to construct a comparison of certain employee categories in order to prepare for that litigation. (Id. at ¶ 11(k); Bermudez Affidavit at ¶¶ 2-3.) Disclosure of Document No. 25 would reveal to Plaintiff what type of comparisons Defendant's counsel determined were relevant to exactly the type of litigation at bar. Plaintiff would, in essence, learn what information Defendant's counsel believed was needed in order to prepare for trial in this case. Therefore, allowing discovery of Document No. 25 would compromise Defendant's ability to prepare for trial beyond Plaintiff's prying eyes. It would give a distinct advantage to Plaintiff, who would know the mental impressions, and possibly be able to deduce the legal theories, of Defendant's counsel. It would contravene public policy, and should not be allowed. Therefore, Defendant respectfully requests that the Court find that Plaintiff has no need for Document No. 25 because he can substantially recreate the document on his own, or in the alternative, Document No. 25 contains the mental impressions of Defendant and thus is not subject to discovery.

IV.    Conclusion.

Because Document No. 25 is attorney-client privileged and work product that contains the mental impressions of counsel, it should not be produced, as its production would hinder

7

Defendant's ability to prepare for trial. For these reasons, Defendant appeals to the court to find that Document No. 25 is not discoverable and should not be produced.

Respectfully submitted,

KELEHER & McLEOD, P.A.

By _____

Robert C. Conklin
Christa M. Hazlett
PO Box AA
Albuquerque, NM 87103
Telephone: (505)346-4646
*Attorneys for Defendant*
*Public Service Company of New Mexico*

cmh0096

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

THADDEUS M. KORBIN,

     Plaintiff,

vs.

                                     CV-03-1167 MV/ACT

PUBLIC SERVICE COMPANY OF
NEW MEXICO,

     Defendant.

### AFFIDAVIT OF GENE BERMUDEZ

STATE OF NEW MEXICO    )
                         ) ss.
COUNTY OF BERNALILLO  )

GENE BERMUDEZ deposes and states as follows:

1.     In the summer of 2002, I was employed at PNM as Manager of Compensation.

2.     In July or August of 2002, my supervisor, Margie Kufer, asked me to perform work related to the August 22, 2002, reorganization.

3.     In July or August of 2002, Ramon Gonzales, Chief Counsel, Corporate Services, asked me to create EEO Summary Reports (identified on PNM's Privilege Log as Document No. 25) in relation with the August 22, 2002, reorganization.

4.     Mr. Gonzales asked me to perform a demographic analysis of the effect of the impactions on several different categories of employees.

5.     The pages labeled Privileges/PNM Korbin 00066 through 00077 are the final EEO Summary Reports I created.  The pages labeled Privileges/PNM Korbin



EXHIBIT

1

1

00078-00095 contain the same information and comparisons as the final report, but appear in a different format.

6.    I created the Reports as part of my duties as a PNM employee.

7.    At the time Mr. Gonzales requested the Reports, and at the time that I created the Reports, I knew that the Reports would be used by Mr. Gonzales to provide legal advice and services in anticipation of litigation.

8.    I also knew that the reports were highly confidential.

9.    I provided the Reports only to Mr. Gonzales, Margie Kufer, Director of Compensation and Benefits, and Alice Cobb, Senior Vice President of People Services and Development. At the time I sent the e-mail, Ms. Kufer was my supervisor and Ms. Cobb was Ms. Kufer's supervisor. The final Report may also have been provided to Business Partner Vic Silva.

10.    The Reports were intended to be confidential and I have kept them confidential. It is my understanding that the above-named recipients of the Reports have kept them confidential as well.

Gene Bermudez

SIGNED AND SWORN TO before me on January _7_, 2005, by Gene Bermudez.

[seal, if any]

Sandra L. Sanchez
Notary Public

My commission expires:

_5/20/07_

cmh0093

2

1 | SECOND JUDICIAL DISTRICT COURT
COUNTY OF BERNALILLO
2 | STATE OF NEW MEXICO

3

4 | KATHLEEN MAYER, EDUARDO ARGUELLO, MARY FILOSI,
VIOLA GARDUNO, JESSIE CANDELARIA, SUSAN CLARKE,
5 | RICHARD PAULK, DALLAS MICKEY, BERNICE COLEMAN,
SUSAN HANNA and DAVID SUMMERS,
6
        Plaintiffs,
7
        vs.                              NO. CV 2003 06456
8

9 | PUBLIC SERVICE COMPANY,
A New Mexico Corporation,
10
        Defendant.
11

12

13

14

15

**DEPOSITION OF VIC SILVA**
16 | June 23, 2004
1:00 PM
17 | 108 Wellesley Drive, SE
Albuquerque, New Mexico  87106
18
        PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE this
19 | deposition was:

20
TAKEN BY:          ERIC SIROTKIN
21 |                ATTORNEY FOR PLAINTIFFS

22
REPORTED BY:       Kathy M. Godin, RPR, NM CCR No. 102
23 |                RUSSIN REPORTING
                   1608 Fifth Street, NW
24 |                Albuquerque, New Mexico  87102

25

**RUSSIN REPORTING**
KATHY M. GODIN, CCR, RPR
(505) 843-7789

**EXHIBIT**

2

Mayer, et al. vs. Public Service Company
Case 6:03-cv-01167-MV-ACT   Document 89   Filed 01/10/05   Page 12 of 12
6/23/04

6

```
 1    A.   Yes.
 2    Q.   We'll do this little practice at the start here.
 3         Have you reviewed any documents in preparation for your
 4    deposition?
 5    A.   I've looked at the analysis that I did, yes.
 6    Q.   And why don't we go ahead and mark one because we'll be
 7    discussing that later. We'll mark that as Exhibit 1 of your
 8    deposition.
 9         [Exhibit 1 marked for identification.]
10    Q.   Is this the analysis that you're referring to?
11    A.   Yes, it is.
12         MR. CONKLIN. Try to let him finish his question.
13    You have a bad habit of doing that.
14         THE WITNESS. Yes, I do.
15    Q.   (By Mr. Sirotkin) Any other documents that you looked
16    at, any depositions, any statements, any notes, e-mails?
17    A.   I did see an e-mail, in fact, just a couple of days
18    ago.
19    Q.   What was the context of that e-mail?
20    A.   It had to do with a meeting that I was at that --
21    what's his name? Forgive me. The boss.
22    Q.   Sterba?
23    A.   No. He's about to retire from the company. I don't
24    remember his name. Anyway, he had stated -- it was a question
25    about offering a severance package to a one level person -- one
```

7

```
 1    level demotion potential if refused, and the gist of the message
 2    was something to do with that I said that I was working on the
 3    affirmative analysis, and I was getting ready to do the math on
 4    it.
 5         MR. CONKLIN. This is the document referred to in
 6    Ms. Ortiz's deposition.
 7         MR. SIROTKIN. Okay. Yes. I was going to get to
 8    that. Let's, just for ease of discussion today, mark this as
 9    Exhibit No. 2.
10         [Exhibit 2 marked for identification.]
11    Q.   (By Mr. Sirotkin) Is that the e-mail? Take a look at
12    it.
13    A.   Yes, this is it.
14    Q.   And you mentioned about -- is it Mr. Flynn who is
15    retiring?
16    A.   Yes.
17    Q.   Have you had any discussions with anyone else at PNM
18    about this lawsuit, about your testimony?
19    A.   No one else other than the lawyers.
20    Q.   Were you aware of a time in the last year or so in
21    which there was some concern within people services, human
22    services, this area, about there being a possible leak of
23    information to the plaintiffs in this case?
24    A.   No, I was not.
25    Q.   There's never been any discussion with you about any
```

8

```
 1    concerns about them getting information they shouldn't have or
 2    wouldn't usually have?
 3    A.   I have not.
 4    Q.   Where have you been working in the last few years?
 5    What's been your job assignments?
 6    A.   My area of responsibility is, I'm the HR manager of the
 7    southern operations, which means the southern part of the state,
 8    although it begins with Clayton and goes down the eastern side of
 9    the state and then crossing over and then up the west side.
10    Q.   Let's go back and cover some of your employment history
11    at PNM, and give me an idea of the kinds of positions and the
12    areas that you've been involved with and some of your duties.
13    A.   Sure. Of the 32 years, I've spent about six to seven
14    years in community relations so there was a break in human
15    resources, that was community relations. Prior to that, I hired
16    on as a personnel interviewer. That was the basic job, to
17    interview people interested in employment with the company. I was
18    promoted up to a personnel director. At one time I was also the
19    affirmative action employee relations supervisor. Then I went
20    into community relations, came back as a -- I don't remember the
21    title, but it was a personnel person. It was not an interviewer.
22    It was just a personnel analyst. Then from there to the current
23    position of manager of HR.
24    Q.   And as manager of HR, who do you report to?
25    A.   It was Anna, but now it's a gentleman by the name of
```

9

```
 1    Scott McFarland.
 2    Q.   And when did that change?
 3    A.   It's been about two years or coming on two years.
 4    Q.   Was that part of a reorganization that took place that
 5    related to this impaction?
 6    A.   No, not to my knowledge.
 7    Q.   Why was it changed that you would report to
 8    Mr. McFarland?
 9    A.   He was hired on to take on the labor relations,
10    employer relations aspect of the regional operations.
11    Q.   What region?
12    A.   North and south as opposed to just the metropolitan.
13    We have, like, three major areas, and of the three, I took the
14    southern.
15    Q.   Where did Mr. McFarland come from; do you know?
16    A.   I don't know.
17    Q.   How old is Mr. McFarland; do you know?
18    A.   He's about my age.
19    Q.   And how old are you?
20    A.   I'll be 59 next month.
21    Q.   What's your educational background?
22    A.   I have a bachelor's degree in industrial management
23    from UNM, 1970.
24    Q.   During that time, did you have any courses in
25    statistics?
```