





FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

'05 JAN 28 PM 4: 08

CLERK ALBUQUERQUE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THADDEUS M. KORBIN,

          Plaintiff,

vs.

                                     CV-03-1167 MV/ACT

PUBLIC SERVICE COMPANY OF
NEW MEXICO,

          Defendant.

## MEMORANDUM IN SUPPORT OF PUBLIC SERVICE COMPANY OF NEW MEXICO'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMMON LAW CLAIMS OF BREACH OF CONTRACT, MISREPRESENTATION, PROMISSORY ESTOPPEL AND WRONGFUL DISCHARGE

COMES NOW, Defendant Public Service Company of New Mexico ("PNM"), and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits its Memorandum in Support of its Motion for Summary Judgment on Plaintiff's Common Law Claims of Breach of Contract, Misrepresentation, Promissory Estoppel and Wrongful Discharge.

### INTRODUCTION

Plaintiff began working as an Engineer for PNM in 1977. In August 1988 Plaintiff was laid off during a corporate downsizing. Plaintiff was rehired on October 19, 1988 as an Engineer.

In February 2000, Toby Holden, the Director of PNM's System Reliability Division hired Plaintiff to work as an Engineer in the Construction Department, which is a department in System Reliability. Plaintiff's supervisor within the Construction Department was Wayne

Sowell, who reports to Mr. Holden. Mr. Holden's supervisor at the time of the reorganization was John Myers, who was the Vice President of Construction and Reliability.

When Plaintiff initially began working in the Construction Department, his primary duties were to analyze and improve PNM processes. However, in mid-2001, PNM contracted with a company called Fact Based Management ("FBM") to write all of the processes within the Construction Reliability Division, including the Construction Department, into one aggregate plan. As a result, the need for Plaintiff's work on PNM processes was eliminated and Plaintiff's duties became to focus primarily on the drafting of work orders for PNM engineering projects. However, Plaintiff did not like drafting work orders, did not want to draft them, and was not good at doing this work.

In July 2002, PNM President and CEO Jeff Sterba advised PNM employees of changes that he was making in the strategic direction of PNM, including an effort to reorganize and streamline all PNM business functions. He made the decision to reorganize in order to adapt to ongoing changes in the energy industry, including uncertainties in the wholesale energy market and the New Mexico Legislature's repeal of legislation that would have deregulated substantial portions of PNM's business. Management companywide were requested to examine their organizations to determine any positions that could be eliminated or combined. It was this process that led to the impaction of Plaintiff's position.

Specifically, as part of this effort, Mr. Myers instructed Mr. Holden to review System Reliability in an attempt to streamline it, eliminate unneeded positions, and consolidate like functions. Based on his review and with the advice from Mr. Sowell, Mr. Holden determined that Plaintiff's position should be impacted, because, as discussed above, the primary job

2

duties that Plaintiff had been brought in to the Construction Department to perform, process development, were was no longer needed.  Moreover, he determined that Plaintiff did not have the skills to write work orders because he was not good at writing them and had clearly expressed an aversion to writing work orders.   In addition to the elimination of Plaintiff's position, some other positions in Plaintiff's department were transferred to another department.

Plaintiff, along with seventy-one (71) other PNM employees, was impacted (laid off) on August 22, 2002 (the "2002 Downsizing").   Plaintiff's claims arise from the 2002 Downsizing.  This Memorandum addresses Plaintiff's common claims for:  (1) beach of contract; (2) misrepresentation; (3) promissory estoppel; and (4) wrongful discharge.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Plaintiff's Employment with PNM

1.      Plaintiff was hired as an engineer on June 23, 1977.  (Plaintiff's Amended Complaint at ¶ 6.)

2.      Plaintiff's position at PNM was impacted on August 30, 1988.  (Deposition of Plaintiff, attached as **Exhibit A** at 33-34, Affidavit of Becky Chisman, attached as **Exhibit B, B-1.**)

3.      The grounds for the impaction did not relate in any way to Plaintiff's conduct as an employee and Plaintiff was aware of this fact.  (**Exhibit A** at 43-44; Plaintiff's Answer to Interrogatory 14, attached at **Exhibit C.**)

4.      After his impaction, Plaintiff was rehired by PNM with an effective date of October 19, 1988.  (**Exhibit B, B-2.**)

3

5.      Plaintiff's position at PNM was impacted on August 22, 2002.  (Plaintiff's Amended Complaint at ¶ 31.)

**PNM's Employment Policies**

6.      At the time of Plaintiff's rehire in 1988, Plaintiff understood that there were employment policies in effect at PNM.  (**Exhibit A** at 50.)

7.      The employment policies were available to Plaintiff.  (Id. at 51-53.)

8.      PNM policies changed throughout Plaintiff's career at PNM (Id.)

8.      The Introduction to the Human Resources Manual in effect in August 2002, states in pertinent part as follows:

> **This manual is not an employment contract, either express or implied.**

The introduction further states:

> The application of these guidelines is at the sole discretion of the Company.

> The Company may change these guidelines from time to time to respond to business factors, legal considerations and other situations affecting employer-employee relations.

> Employment with the Company is at-will.  That is, either the employee or the employer may end the employment relationship at any time, with or without cause; and with or without notice.

The last sentence of the Introduction states:

> **This manual is not an employment contract, either express or implied.**

(**Exhibits B; B-3**.) (Emphasis in original).

9.      PNM's Separation from the Company Policy (Policy 322), issued 4/92 and

revised on 2/02, states in pertinent part as follows:

* * *

> The Company retains the right to terminate employment at any
> time.

* * *

> **This manual is not an employment contract, either express
> or implied.**

**(Exhibit B, B-4.)**

10.      The Introduction to the Human resources Manual, issued 4/24/92, states in

pertinent part as follows:

> **This Manual is not an employment contract, either express
> or implied.**

Applicability

> This manual contains guidelines about employment matters at
> Public Service Company of New Mexico (PNM).    The
> application of these guidelines is at the sole discretion of the
> Company.  The Company may change these guidelines from
> time to time to respond to business factors, legal considerations
> and other situations affecting employer-employee relations.

> Employment with the Company is at-will.  That is, either the
> employee  or  the  employer  may  end  the  employment
> relationship at any time, with or without cause, and with or
> without notice.

**(Exhibit B, B-5.)**

11.    The Separation from the Company Policy Statement, revised 5/88, states in pertinent part as follows:

> Separation from the Company may be initiated by the employee (resignation or retirement), by the Company (dismissal or discharge), or caused by circumstances beyond control of either (death).
>
> * * *
>
> Dismissal/Discharge
>
> The Company retains the right to terminate employment at any time.

**(Exhibit B, B-6.)**

12.    The Introduction to the PNM Policy Manual, revised 05/86, states in pertinent parts as follows:

> This manual contains policies and procedures governing various employment matters at the Public Service Company of New Mexico's Electric Utility.
>
> * * *
>
> The Electric Utility's policies and procedures ARE NOT an employment contract, either express or implied. They are intended to be used as a guide, subject to interpretation by the Company, and the Company retains the right to modify them at its sole discretion.

**(Exhibit B, B-7.)**

13.    The Industrial Relations Policies, revised 01/82, states in pertinent part as follows:

> * * *
>
> It is essential that the policies contained herein be administered so as to contribute to the success of PNM and to the success of

6

> PNM employees. For this reason, it should be understood that there is sufficient flexibility to permit exceptions where the overall best interests of PNM would not be served by strict application.

**(Exhibit B, B-8.)**

14.    PNM's 2/78 revision of PNM's Severance Policy Statement (Policy 522), provided in pertinent part as follows:

> It is the Company's intent to provide continuous employment to each employee; however, conditions may arise which necessitate the dismissal or termination of an employee.

**(Exhibit B, B-9.)**

## ARGUMENT

**I.**     **Summary Judgment Should be Granted on Plaintiff's Contract Claims**

In New Mexico, a presumption exists that every "employment contract is for an indefinite period and is terminable at the will of either party...." Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993). Plaintiff alleges that his employment with PNM was subject to an exception to the general presumption of at will employment because: (1) PNM allegedly expressly agreed to limit its right to terminate Plaintiff's employment at will; and (2) PNM, allegedly through its statements and conduct, implied that its right to terminate Plaintiff was subject to certain limitations. (Amended Complaint at 11-12; **Exhibit C** at Interrogatory Answer 2, 14.)

**A.     No express contract limits PNM'S right to terminate Plaintiff at will**

Plaintiff alleges that PNM agreed to limit its right to terminate Plaintiff at will by agreeing to two separate express provisions. First, Plaintiff asserts that PNM agreed when he was hired in 1977, that Plaintiff could be terminated only for cause. (Amended Complaint at

7

11-12.)  Second, in an attempt to circumvent the fact that Plaintiff clearly knows based on his 1988 impaction that he could be terminated without cause, Plaintiff alleges that in the mid-1980s, PNM agreed that, when circumstances arose under which PNM needed to impact employee positions without cause, PNM would protect employees with seniority by impacting new employees first.  (Id.: **Exhibit C** at Interrogatory Answer 14.)

In order to succeed in his claim that PNM agreed to these limitations, Plaintiff must point to "an express contractual provision." Hartbarger, 115 N.M. at 668, 857 P.2d at 779. As with all contract claims, Plaintiff cannot establish that the contractual provisions were part of his employment agreement with PNM unless he establishes that they resulted from an offer, an acceptance, consideration, and mutual assent.  DeArmond v. Halliburton, 2003-NMCA-148, ¶ 9, 134 N.M. 630 (setting forth elements of a valid contract); see also Kiedrowski v. Citizens Bank, 119 N.M. 572, 577, 893 P.2d 468, 473 (Ct. App. 1995) (applying mutual assent requirement to claim that an express for cause provision limited the at will employment relationship).  However, Plaintiff cannot establish sufficient evidence to support any of these elements.

Notably, Plaintiff has not identified any formal written contract on which he basis his express contract claims.  Instead, Plaintiff refers to general oral statements that he alleges were made by PNM representatives and to general descriptions of written PNM employee policies.  (**Exhibit C** at Interrogatory Answers 3, 14.)  When Plaintiff's allegations are scrutinized, however, it is clear that this evidence is entirely insufficient to withstand summary judgment.

1.    **Statements made upon Plaintiff's hire in 1977**

With regard to the statements that PNM representatives allegedly made to Plaintiff upon his hire in 1977, these alleged statements, i.e., that the position was a "permanent" and "long-term" employment opportunity, even if true, could not have established an express contract as a matter of law.

First, Plaintiff did not give the requisite consideration for a contract that purported to limit PNM's right to terminate Plaintiff at will. In Hartbarger, the New Mexico Supreme Court stated that prior to 1980, the uniform rule in New Mexico was that an employment contract for permanent employment that was not supported by consideration "beyond the performance of [the employee's] duties" was terminable at will.[1] Hartbarger, 115 N.M. at 669, 857 P.2d at 780; see also Gonzales v. United Southwest Nat'l Bank of Santa Fe, 93 N.M. at 522, 524, 602 P.2d 619, 621 (holding in 1979 that a contract providing for lifetime employment was terminable at will due to insufficient consideration from the employee). Plaintiff cannot establish that he gave any consideration in exchange for PNM's alleged promises other than the performance of his duties. As a result, Plaintiff did not, as a matter of law, enter into a contract for permanent employment with PNM in 1977.[2]

Second, the alleged PNM statements from 1977 were also insufficient to establish an express contract limiting PNM's right to terminate Plaintiff at will because Plaintiff cannot

---

[1] Examples of the type of additional consideration that an employee might offer in exchange for a limitation on an employer's ability to terminate him include an employee's agreement to work for a specific period of time or a decision to terminate prior employment in order to take a new position. See e.g. Collins v. Parsons College, 203 N.W.2d 594, 599 (Iowa 1973).

[2] It is an established rule of law that contracts incorporate the relevant laws that existed at the time of the formation of the contract. Durham v. Southwest Developers Joint Venture, 2000-NMCA-10, ¶ 18, 128 N.M. 648.

establish that the parties mutually assented to any such limitation. "When the minds of the parties have not met on any part or provision of a proposed contract, all of its portions are a nullity." Trujillo v. Glen Falls Ins. Co., 88 N.M. 279, 280, 540 P.2d 209, 210 (1975) (quoting Lamonica v. Bosenberg,73 N.M. 452, 455, 389 P.2d 216, 217 (1964)).  Plaintiff refers to statements that were allegedly made regarding the "permanent" and "long term" nature of Plaintiff's employment at the time he was hired.  (**Exhibit C** at Interrogatory Answer 3.) However, even assuming that these statements were made, their utterance could not, as a matter of law, have indicated that PNM assented to limit its right to terminate Plaintiff at will.

At the time of Plaintiff's hire in 1977, the term "permanent," when used in the context of an employment agreement, meant "steady employment, as opposed to temporary or part-time employment" and therefore did not refer to employment that could be terminated only for cause.  Gonzales, 93 N.M. at 524, 602 P.2d at 621.  Given this meaning, general references by PNM employees or even by PNM's employment policies to the "permanent" nature of Plaintiff's employment indicated only that PNM assented to provide Plaintiff with steady employment, as opposed to employment that was only part-time or temporary.  As a result, no contract was formed as a matter of law.  DeArmond, 2003-NMCA-148, at ¶ 20 ("[p]arties can be said to mutually assent to a contract when they have the same understanding of the contract's terms; where they attach materially different meanings to the terms, there is no meeting of the minds").  Moreover, this Court has stated that "optimistic expressions about the future and statements which are informal in character and express only long continuing good will and hope for eternal association are insufficient to establish an oral contract for permanent employment."  Levine v. Invensys Building Stytems, Inc., Civ. No. 03-00546

MV/LFG at 10 (June 14, 2004) (unpublished) (attached) quoting Kercher v. Forms Corp. of America, Inc., 630 N.E.2d 978, 981 (Ill.App.Ct. 1994).

### 2.    Statements in PNM policies

Plaintiff also refers to statements that PNM allegedly made in its employment policies alternatively referring to just cause termination and to guidelines for the manner in which PNM would select employees for termination if an impaction was necessary. These claims are insufficient to withstand PNM's motion for summary judgment for a number of reasons.

Plaintiff has not identified the employment policies to which he refers and has not indicated the exact language which he claims constituted an express contractual offer. Under New Mexico law, an express offer must consist of "a proposal setting forth the essential terms of the prospective transaction." Naranjo v. Paull, 111 N.M. 165, 169, 803 P.2d 254, 258 (Ct. App. 1990) (citing 1 A. Corbin, Corbin on Contracts § 11, at 26 (1963) ("[i]n order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all the terms of the contract to be made."); also citing Restatement (Second) of Contracts §§ 24, 33 (1981) (definition of offer;  requirement of reasonable certainty before offer can be accepted so as to form a contract)). Without identifying the specific language that was used, Plaintiff cannot, as a matter of law, establish that PNM made an offer that could give rise to a binding contract.

Moreover, a review of New Mexico case law reveals no cases in which an employment manual or handbook setting forth policies and procedures gave rise to an express contractual provision limiting an employer's presumed right to terminate employees at will. To the contrary, the many New Mexico cases interpreting such manuals have considered

whether their provisions give rise to an <u>implied</u> contractual agreement.  <u>E.g.</u> <u>Hartbarger</u>, 115 N.M. at 672-73, 857 P.2d at 783-84.  As such, Plaintiff's express contractual claim fails as a matter of law.

**B.      No implied contract limits PNM'S right to terminate Plaintiff at will**

New Mexico case law recognizes that under limited circumstances, an employer's statements and conduct can create an implied contractual provision that alters at will employment.  <u>Hartbarger</u>, 115 N.M. at 668, 857 P.2d at 779.

Plaintiff alleges that, regardless of whether PNM expressly agreed to limit its right to terminate Plaintiff, the circumstances surrounding Plaintiff's employment implied that Plaintiff was entitled to certain protections from termination.  (Amended Complaint at 11-12.) In support of this claim, Plaintiff relies on the same evidence, set forth above, that he cites in support of his express contract claim.  (**Exhibit C** at Interrogatory Answer 3.)  However, the facts of Plaintiff's claim against PNM do not support such a finding and summary judgment in favor of PNM on this claim is therefore proper.

In evaluating the evidence that Plaintiff has presented in support of his implied contract claim, the Court should consider the "totality of the circumstances" surrounding Plaintiff's employment at the time an implied contract allegedly was formed, including the "norms of conduct" and "employer representations."  <u>Kiedrowski</u>, 119 N.M. at 575, 893 P.2d at 471 (Ct. App. 1995).  Importantly, such circumstances cannot give rise to implied contractual provisions as a matter of law if PNM's conduct is not "sufficiently explicit to create a reasonable expectation of an implied contract."  <u>Trujillo v. Northern Rio Arriba Elec. Co-op, Inc.</u>, 2002-NMSC-004, ¶ 22, 131 N.M. 607.  While the determination of what

constitutes an employee's reasonable expectations is a question of fact for the jury, an employee's expectations cannot be reasonable as a matter of law unless they "satisfy a certain threshold of objectivity." Kiedrowski, 119 N.M. at 575, 893 P.2d at 471 (citing Kestenbaum v. Pennzoil Co, 108 N.M. 20, 23, 766 P.2d 280, 283 (1988)).  When applied to the facts of Plaintiff's claim, this standard compels summary judgment in PNM's favor.

### 1.    Statements made upon Plaintiff's hire in 1977

When the circumstances surrounding the statements that PNM allegedly made in 1977 regarding the "permanent" nature of Plaintiff's employment are analyzed, it is clear that no implied contract was formed at that time. New Mexico law regarding at will employment was substantially different when Plaintiff was hired in 1977 than it is today.  For example, at the time of Plaintiff's hire, New Mexico courts had not even recognized that a limitation on at will employment could be implied from employment policies and from the conduct of the parties. Forrester v. Parker, 93 N.M. 781, 606 P.2d 191 (1980) (recognizing for the first time that an employment contract could be implied from the conduct of the parties).  Additionally, New Mexico case law at the time of Plaintiff's hire explicitly recognized that an employer's use of terms such as "permanent" and "long term" to describe a position did not, as a matter of law, refer to any employment other than employment that is terminable at the will of either party.  Gonzales, 93 N.M. at 524, 602 P.2d at 621.  Given this context, Plaintiff's claim that a for cause provision should be implied from the statement and conduct of PNM at the time that Plaintiff was initially hired is entirely without merit.

### 2.    Statements in PNM policies

13

Plaintiff also alleges that statements in PNM's employment manuals gave rise to implied contractual agreements regarding PNM's right to terminate Plaintiff at will.   As noted, Plaintiff has not pointed to any language in PNM's policies in support of this contention and Plaintiff therefore cannot meet the requirement that such language be sufficiently explicit to give him a reasonable expectation that his employment was not terminable at will.   Trujillo, 2002-NMSC-004, ¶ 22.

Even if Plaintiff could identify any such language, New Mexico law makes it clear that language of a non-promissory nature that is merely a declaration of an employer's general approach to employment is not sufficiently specific to alter the at will employment presumption.   Sanchez v. The New Mexican, 106 N.M. 76, 78, 738 P.2d 1321, 1324 (1987). Plaintiff cannot identify any statements that were made by PNM that fell outside of this category.

Additionally, the fact that courts are to consider the circumstances surrounding an alleged implied contractual agreement is fatal to Plaintiff's claim.   As noted, PNM's conduct during the early years of Plaintiff's employment must be considered in light of the fact that terms in an employment manual could not give rise to an implied employment contract until 1980.   Forrester, 93 N.M. 781, 606 P.2d 191.   Moreover, any statements or conduct identified by Plaintiff must also be considered in light of the facts that, as early as 1978, PNM's policies specifically stated that employment could be terminated without cause.   (UMF 14.) Specifically, PNM's 1978 policies provided that "[i]t is the Company's intent to provide continuous employment to each employee; however, conditions may arise which necessitate the dismissal or termination of an employee."   (Id.)  Under New Mexico law, the presence of

14

this language provides strong support for the conclusion that, as a matter of law, Plaintiff could not have reasonably believed that his employment was not terminable at will. <u>Garrity</u>, 1996-NMSC-032, ¶ 12, 121 N.M. 710 (employment manual that "reserve[d] the right to terminate any employee without notice for any reason (as long as such termination is not in violation of law" held to invalidate implied contract claim).

Finally, to the extent that Plaintiff contends that an implied contractual provision vesting Plaintiff with the right to be terminated only for cause was created subsequent to 1988, this contention is untenable for a separate reason. Plaintiff's employment with PNM was initially terminated on August 30, 1988. (UMF 2.) Plaintiff was aware that the impaction was entirely unrelated to Plaintiff's conduct and therefore was not a for cause termination. (UMF 3.) Any contention that PNM conduct subsequent to that date gave rise to a reasonable expectation of for cause employment therefore is not objectively reasonable as a matter of law.

C.      **Assuming *arguendo* that the parties initially agreed that Plaintiff's employment could not be terminated at will, such an agreement did not exist at the time of the 2002 Downsizing**

Assuming *arguendo* that Plaintiff's employment with PNM initially contained an express or implied for cause provision, such a provision did not govern Plaintiff's employment with PNM at the time of the 2002 Downsizing. This is true for two distinct reasons.

1.      **PNM validly modified any implied for cause provision**

It is undisputed that by the time that Plaintiff was impacted in August 2002, PNM had a well-established and longstanding policy that all non-union employment with PNM was

terminable at will.  New Mexico law provides that an employer may unilaterally amend the terms of any employment contract so long as the employee knows of the changes and continues his employment with the company.  E.g. DeArmond, 2003-NMCA-148, at ¶ 27 ("[a]n employer may still insist on prospective changes in the terms of employment as a condition of continued employment").

At the time of his 2002 Downsizing, and consistently at least since 1986, PNM's employment policies specifically provided that all non-union employment with PNM was at will.  (UMF's 9-13.)  Therefore, regardless of whether an express or implied contractual provision initially limited PNM's ability to terminate Plaintiff at will, the explicit language in PNM's later employment policies clearly modified such provisions, returning Plaintiff's employment to an at will status.  Plaintiff had access to the policies and knew that they routinely changed (UMF's 7, 8).  Moreover, he continued to work for PNM throughout these changes.  Thus, if there was a contract, Plaintiff agreed to the modifications.

Some jurisdictions have held that this rule does not apply in circumstances where the employer seeks to modify an employment agreement by removing restrictions on the employer's right to terminate the employee at will.  See e.g. McIlravy v. Kerr-McGee Corp., 119 F.3d 876 , 881 (10th Cir. 1997) (applying Wyoming law).  However, New Mexico courts have not recognized such an exception and the court therefore should not do so in this case.

### 2.   Plaintiff's contract claims are limited to the period following his rehire in 1988

Although Plaintiff was initially employed by PNM in 1977, the employment agreement that was formed at that time did not exist at the time of the 2002 Downsizing.

Plaintiff was initially terminated in a 1988 impaction. (UMF 2.) Although Plaintiff was eventually rehired months later (UMF 4), Plaintiff's acceptance of a new job offer from PNM constituted a novation, thereby replacing Plaintiff's former employment agreement with a new agreement. Maulsby v. Magnuson, 107 N.M. 223, 226, 755 P.2d 67, 70 (1988) (stating elements of a valid novation).

The implications of this novation are significant. Assuming, *arguendo*, that Plaintiff's initial employment was not terminable at will, whether due to an implied or express contractual provision, these contractual provisions were eliminated as a result of Plaintiff's 1988 impaction and the subsequent novation that occurred upon Plaintiff's rehire. Thus, in order to succeed with his breach of contract claim, Plaintiff must rely exclusively on any contractual agreements that arose at the time of or subsequent to his rehire in October 1988. In fact, Plaintiff was aware that there were policies in effect in 1988 upon his rehire. (UMF 6) Plaintiff has not established any evidence that is sufficient to establish that an agreement altering at will employment was formed in or after 1988. In fact, PNM policies made it clear that Plaintiff could be terminated for any reason, (UMF's 12, 13) and since at least 1982 made clear that they were flexible. (UMF 14)

## II. Summary judgment should be granted on Plaintiff's misrepresentation claim

Plaintiff alleges in Count III of his Complaint that PNM made "false and misleading statements" to Plaintiff regarding Plaintiff's "long-term future employment" with PNM and that the PNM representatives who made these statements intended for them to be false and misleading or made them recklessly. (Amended Complaint at 12.) Under New Mexico law, this claim is referred to as "fraudulent misrepresentation." Gouveia v. Citicorp, Inc., 686 P.2d

262, 266 (Ct. App. 1984). The elements of such a claim are: (1) an intentional or reckless misrepresentation of fact; (2) that is made with the intent to deceive and induce the injured party to act upon it; and (3) upon which the injured party actually and detrimentally relies).

This claim must be viewed in light of Fed.R.Civ.P. 9(b), which requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This means that the Plaintiff's complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Koch v. Koch Industries, Inc. 203 F.3d 1202, 1236 (10th Cir. 2000). The only representation that Plaintiff has identified with sufficient particularity to even approach the requirements of Fed.R.Civ.P. 9(b) is Plaintiff's contention that he "relied to his detriment on promises made by PNM representatives causing him to accept a transfer to the Service Center, giving up his stable position with the Palo Verde Team..." (Amended Complaint at 12.) Accordingly, the court must limit Plaintiff's fraud claim to this allegation. Koch, 203 F.3d at 1236.

Plaintiff's deposition testimony clarifies that the alleged statement upon which he bases his fraudulent misrepresentation claim was made by PNM manager Chris Hickman. (**Exhibit A** at 79.) Specifically, Plaintiff testified that Chris Hickman asked Plaintiff to continue working at in the PNM electric service delivery division as opposed to returning to his work in the PNM electricity generation division by stating the following:

> "Well, we've got a lot of things that I want you to continue
> working on." And he referenced things like his TAMIS project.
> He indicated that he wanted me to head up a streetlight
> assessment project. There were a lot of project modifications
> and process improvement issues that he directed my attention
> to; plus, he mentioned that the service center was faced with a

18

> dilemma of having lots of folks going to retire in the very near future, and they needed to, you know, train, create new management. So that's where -- that was the carrot he got me to come over on-board with.

**(Exhibit A** at 78.)

Plaintiff's claims fail because he cannot show any misrepresentation of fact. Even assuming Mr. Hickman made these statements, there is no evidence they were false or that he did not believe them.

Second, Plaintiff cannot establish that Mr. Hickman made these statements with the present intent to deceive Plaintiff. Chavez v. Chenowith, 89 N.M. 423, 429, 553 P.2d 703, 709 (Ct. App. 1976) (indicating that a valid fraud claim must show "a present intent not to keep the promise"). First, Plaintiff cannot make this showing because there is no evidence that Mr. Hickman intended to deceive Plaintiff regarding anything. In fact, Plaintiff specifically admitted in his deposition that Mr. Hickman honored the referenced statement by transferring Plaintiff to the electric service delivery division and appointing Plaintiff to head up a streetlight assessment project. **(Exhibit A** at 80, 85-86.) Second, there is no evidence that Mr. Hickman knew of the 2002 Downsizing at the time that he made these statements. See Invensys, Civ. No. 03-00546 MV/LFG at 14. Accordingly, PNM is entitled to summary judgment.

**III.    Summary judgment should be granted on Plaintiff's promissory estoppel claim**

Plaintiff also asserts a promissory estoppel claim. (Amended Complaint at 12.) Plaintiff presumably relies on the same statement by Mr. Hickman that Plaintiff alleges constituted a fraudulent misrepresentation. (Id.) The elements of a promissory estoppel claim are: (1) a promise; (2) Plaintiff must have reasonably relied on the promise; (3) Plaintiff's

19

reliance on the promise was reasonably foreseeable to PNM; and (4) Plaintiff suffered some economic loss or other detriment as a result of his reliance on the promise. UJI NMRA 13-815 (2005).

Moreover, inherent in the claim of promissory estoppel is the assumption that a promise has not been kept. Based on the statements that Plaintiff attributes to Mr. Hickman, Plaintiff cannot present any evidence to support the contention that Mr. Hickman did not keep the promises that he allegedly made. Plaintiff admits that Mr. Hickman gave him a position and appointed him to the streetlight project. (**Exhibit A** at 80, 85-86.) Thus, Plaintiff cannot establish that Mr. Hickman failed to honor any promise.

**VI.   Summary   judgment   should   be   granted   on   Plaintiff's   wrongful termination/retaliatory discharge claim**

Plaintiff asserts in Count IV a claim for "wrongful termination." (Amended Complaint at 12.) This tort is more commonly referred to in New Mexico as "retaliatory discharge." Sken v. Plains Elec. Generation and Transmission Co-op, Inc., 2002-NMSC-021, ¶ 8, 132 N.M. 401 (indicating that "wrongful termination" and "retaliatory discharge" claims are synonymous). Plaintiff bases his retaliatory discharge claim on two alleged acts by PNM. First, Plaintiff alleges that PNM is liable because PNM has not considered Plaintiff for rehire as a result of Plaintiff's decision to file age discrimination claims. (Amended Complaint at 12-13.) Second, Plaintiff alleges that "[o]ne of the motivating factors in PNM's termination of [Plaintiff] was due to his age..." (Id.) PNM is entitled to summary judgment on both claims.

20

**A.     Conduct performed outside the employment relationship cannot constitute retaliatory discharge as a matter of law**

As noted above, employment in New Mexico is presumed to be terminable at the will of either the employer or the employee. The tort of retaliatory discharge has developed as a narrow exception to the at will employment relationship, providing that certain grounds for termination are contrary to New Mexico public policy and therefore illegal. Shovelin v. Central New Mexico Elec. Co-op., Inc., 115 N.M. 293, 850 P.2d 996 (1993). Plaintiff contends that PNM is liable for retaliatory discharge because it refused to rehire Plaintiff as a result of conduct that he engaged in while he was no longer a PNM employee. (Amended Complaint at 13.) However, recognizing a wrongful discharge cause of action under these circumstances would do violence to the rationale behind the tort of retaliatory discharge.

In Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp., 106 N.M. 19, 20, 738 P.2d 513, 515 (1987), the New Mexico Supreme Court identified the rationale behind the retaliatory discharge exception to at will employment, stating that "[t]he express reason for recognizing this tort, and thus modifying the terminable at-will rule, was 'the need to encourage job security' for those employees not protected from wrongful discharge by an employment contract..." Id. However, Plaintiff bases his claim on conduct, the filing of his EEOC discrimination claim, that Plaintiff engaged in after he was terminated by PNM. (Amended Complaint at 13.) As a result, any redress of this alleged wrong does not further the purpose of the retaliatory discharge claim. Hurley v. Allied Chemical Corp. 262 S.E.2d 757, 759 (W.Va. 1980) (rejecting a retaliatory discharge claim based on an employer's refusal to hire because "[a]n essential ingredient for [retaliatory discharge] is an existing employment relationship between the parties"). Accordingly, this claim should be dismissed.

21

**B.**   **Employment termination motivated solely by an employee's age cannot constitute retaliatory discharge as a matter of law**

Plaintiff also asserts that PNM is liable for retaliatory discharge because it terminated him because of his age.  To succeed with such a claim, Plaintiff must prove that he was terminated because he performed an act that public policy has authorized or would encourage. Vigil v. Arzola, 102 N.M. 682, 688, 699 P.2d 613, 619 (Ct. App. 1983), rev'd in part on other grounds by 101 N.M. 687, 687 P.2d 1038 (1984), overruled in part on other grounds by Chavez v. Manville Prods. Corp., 108 N.M.  643, 777 P.2d 371 (1989).  This requires that Plaintiff prove that his actions were not "merely private or proprietary" but rather were undertaken to "further the public good."  Gutierrez v. Sundancer Indian Jewelry, Inc., 117 N.M. 41, 48, 868 P.2d 1266, 1273 (Ct. App. 1993); Garrity, 1996-NMSC-032, ¶ 18.  Plaintiff appears to assert that his status as a fifty-one-year-old PNM employee was sufficient to constitute an act that he undertook to "further the public good."  This position is untenable.

A review of the New Mexico cases that have recognized conduct sufficient to support a cause of action for retaliatory discharge indicates that Plaintiff's conduct is clearly insufficient.  Shovelin, 115 N.M. at 304, 850 P.2d at 1007.  Most commonly recognized are cases involving discharge for "whistle-blowing," i.e., reporting illegal activities by the employer to appropriate public authorities. Boudar v. E.G. & G., 106 N.M. 279, 742 P.2d 491 (1987). Courts have also generally recognized that an employee's refusal to participate in an illegal activity, and acts committed in contravention of criminal codes or other laws, also meet the public policy requirement and provide grounds for a wrongful discharge claim.  See, e.g, Garrity, 1996-NMSC-032, ¶ 17.

Plaintiff has not provided any evidence that he engaged in conduct that could be categorized as engaged in for the public good. To the contrary, Plaintiff asserts only that he was fifty-one-years-old and that he was terminated because of his age. (Amended Complaint at 10.) This conduct was indisputably private in nature. No New Mexico case has ever held that an employee's decision to work after a certain age constitutes conduct that is sufficiently public to be actionable under this tort. Plaintiff's retaliatory discharge claim must be dismissed.

**C.    Plaintiff's retaliatory discharge claim is incompatible with his contract claims**

If the court holds that PNM contractually agreed, whether expressly or impliedly, to limit its right to terminate Plaintiff at will, Plaintiff's retaliatory discharge claim must be dismissed. Silva, 106 N.M. at 21, 738 P.2d at 515 (1987) (stating that the principle that the tort of retaliatory discharge is inapplicable when employee is protected from discharge by a contract).

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendant respectfully requests that this Court grant its Motion for Summary Judgment, dismissing Plaintiff's breach of contract, misrepresentations, promissory estoppel and wrongful discharge claims with prejudice, and for such other relief as this Court deems proper.

Respectfully submitted,

KELEHER & McLEOD, P.A.

By _____
Robert C. Conklin
John K. Ziegler

23

Nikolai N. Frant
P.O. Box AA
Albuquerque, NM  87103
(505) 346-4646
*Attorneys for Public Service*
*Company of New Mexico*

David F. Cunningham
Rubin Katz Law Firm, P.C.
P.O. Box 250
Santa Fe. NM  87504
(505) 982-3610
*Attorneys for Public Service*
*Company of New Mexico*

I hereby certify that a true and
correct copy of the foregoing
was hand delivered this 28th
day of January, 2005 to Plaintiff's
counsel of record:

Nikolai Frant for JKZ
John K. Ziegler

jkz0431

24

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN.  SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**